Affirmed and Memorandum Opinion filed June 19, 2003










Affirmed and Memorandum Opinion filed June 19, 2003.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00297-CV

____________

 

INTERCARGA,
S.A.,
Appellant

 

V.

 

FRITZ
COMPANIES, INC., Appellee/Cross-Appellant

 

V.

 

GERMAN PATRICIO RUIZ,
Cross-Appellee

 



 

On Appeal from the
334th District Court

Harris County, Texas

Trial Court Cause
No. 01-32047

 



 

MEMORANDUM  OPINION

Appellant Intercarga,
S.A. appeals the trial court=s
overruling of its special appearance, and appellee/cross-appellant Fritz
Companies, Inc. appeals the trial court=s
sustaining of cross-appellee German Patricio Ruiz=s
special appearance.  We affirm the trial
court=s order.








                                                                              




I.  Factual and
Procedural Background

In 1997 Arco Oriente,
Inc., n/k/a Agip Oil Ecuador B.V. (“Arco”) was looking for a freight forwarder
in the United States to handle transportation of oil equipment from Houston to
Ecuador (“Arco Project”).  Arco invited
Fritz and other freight forwarders to bid on the Arco Project and required that
these freight forwarders have a local presence in Ecuador to qualify for the
project.  Because Fritz did not have an
office in Ecuador, it contacted Intercarga to discuss its possible
participation in the project. 
Eventually, Fritz selected Intercarga to be its local presence on the
bid for the Arco Project, and Arco accepted the Fritz bid. Intercarga and Arco
signed the contract for the Arco Project. 
Intercarga and Fritz allegedly had a contract regarding their
relationship for the Arco Project.  Fritz
alleges that under this contract, Fritz would bill Intercarga for its services
on the Arco Project.  Intercarga would
then bill Arco, collect the payments for these services, and wire transfer
these sums to Fritz in San Francisco, California.  

A dispute arose between
Fritz and Intercarga concerning the amount, if any, owed by Intercarga to
Fritz.  Fritz filed suit against
Intercarga and German Patricio Ruiz, the majority shareholder and former
general manager of Intercarga.  Fritz
alleged that Intercarga did not pay Fritz for more than $1.7 million dollars
worth of services and materials provided by Fritz on the Arco Project.  Fritz asserted claims for sworn account,
breach of contract, breach of fiduciary duty, fraud and conversion against
Intercarga.  Fritz also asserted that the
corporate veil between Intercarga and Ruiz should be pierced because Ruiz
allegedly used Intercarga to perpetrate an actual fraud on Fritz and because
Intercarga allegedly is the alter ego of Ruiz.

 
          Intercarga and Ruiz both
filed special appearances contesting the trial court=s ability to exercise
personal jurisdiction over them.  Without
conducting an evidentiary hearing, the trial court signed an order sustaining
Ruiz=s special appearance and
overruling Intercarga=s
special appearance.  Intercarga has
appealed the overruling of its special appearance, and Fritz has
cross-appealed, challenging the trial court=s
sustaining of Ruiz=s
special appearance.








                                                    II. 
Standard of Review

A defendant challenging a
Texas court=s
personal jurisdiction over it must negate all jurisdictional bases, except that
the plaintiff must prove any allegations that seek to pierce the corporate veil
of any of the defendants.  BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d
789, 793B99 (Tex. 2002).  Whether a court has
personal jurisdiction over a defendant is a question of law subject to de novo
review.  Id. at 794.  However, the trial court
frequently must resolve questions of fact before deciding the jurisdiction
question.  Id.  

In this case, the trial
court did not issue findings of fact and conclusions of law with its special
appearance ruling.  Therefore, all facts
necessary to support the judgment and supported by the evidence are implied.   Id. at 795.  Parties may challenge the legal and factual
sufficiency of these implied factual findings, and we review the trial court=s legal conclusions de
novo.  Id. at 794B95.  In conducting a no-evidence analysis, we review the evidence
in a light that tends to support the disputed findings and disregard all
evidence and inferences to the contrary. 
Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 782 (Tex.
2001).  If more than a scintilla of
evidence exists, it is legally sufficient. 
Id.  More than a scintilla
of evidence exists if the evidence furnishes some reasonable basis for
differing conclusions by reasonable minds about a vital fact=s existence.  Id. at 782B83. 









When reviewing a challenge to the factual sufficiency of the
evidence, we examine the entire record, considering both the evidence in favor
of, and contrary to, the challenged finding. 
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  After considering and weighing all the
evidence, we set aside the fact finding only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986).  The trier of fact is
the sole judge of the credibility of the witnesses and the weight to be given
to their testimony.  GTE Mobilnet of
S. Tex. v. Pascouet, 61 S.W.3d 599, 615B16 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  We may not substitute our own
judgment for that of the trier of fact, even if we would reach a different
answer on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  The amount of evidence necessary to affirm a
judgment is far less than that necessary to reverse a judgment.  Pascouet, 61 S.W.3d at 616. 

                                               III. Analysis and Discussion

A. 
Did the trial court err in overruling Intercarga’s
special appearance?

 In its sole issue on appeal, Intercarga
alleges the trial court erred in overruling its special appearance.  The Texas long-arm statute governs Texas
courts= exercise of jurisdiction
over nonresident defendants.  See Tex. Civ. Prac. & Rem. Code '' 17.041B .045; BMC Software Belgium, N.V., 83 S.W.3d at 795.  The Texas long-arm statute allows
Texas courts to exercise personal jurisdiction “as far as the federal
constitutional requirements of due process will permit.”  BMC Software Belgium, N.V., 83 S.W.3d at 795. 
(quoting U-Anchor Adver., Inc. v. Burt, 553 S.W.2d 760, 762
(Tex. 1977)).  Thus,
we rely on precedent from the United States Supreme Court and other federal
courts, as well as Texas decisions, in determining whether a nonresident
defendant has shown that exercise of personal jurisdiction over it would
violate federal due-process guarantees.  Id.








Personal jurisdiction
over nonresident defendants is constitutional when two conditions are met: (1)
the defendant has established minimum contacts with the forum state, and (2)
the exercise of jurisdiction comports with traditional notions of fair play and
substantial justice.  Id.  A nonresident defendant that has
“purposefully availed” itself of the privileges and benefits of conducting
business in Texas has sufficient contacts to allow Texas courts to exercise
personal jurisdiction over the nonresident. 
Id.  Although not
determinative, foreseeability is an important consideration in deciding whether
the nonresident defendant has purposefully established “minimum contacts” with
Texas.  Id.  The concept of “foreseeability” is
implicit in the requirement that there be a “substantial connection” between
Intercarga and Texas arising from Intercarga=s
conduct purposefully directed toward Texas. 
See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 227 (Tex. 1991). 
However, a defendant should not be subject to a Texas court=s jurisdiction based upon
“random,” “fortuitous,” or “attenuated” contacts.  BMC Software Belgium, N.V., 83 S.W.3d at 795.  Because of the unique and
onerous burden placed on a party called upon to defend a suit in a foreign
legal system, the minimum contacts analysis is particularly important when the
defendant is from a different country.  Id.

The first prong of the
personal jurisdiction test is satisfied if the nonresident defendant=s minimum contacts give
rise to either specific jurisdiction or general jurisdiction.  Id. 
Specific jurisdiction exists if the defendant=s alleged liability
arises from or is related to an activity conducted within the forum.  Id. at 796.  In a specific jurisdiction analysis, we focus
on the relationship among the defendants, the State of Texas, and the
litigation.  See Schlobohm v. Schapiro,
784 S.W.2d 355, 357 (Tex. 1990).  We
consider whether Intercarga purposefully directed its activities to Texas and,
if so,  whether Fritz=s claims arose out of or
relate to those activities.  Zac Smith
& Co., Inc. v. Otis Elevator Co., 734 S.W.2d 662, 663  (Tex. 1987). 
In contrast, general jurisdiction is present when a defendant=s contacts with Texas are
continuous and systematic so that Texas courts may exercise personal
jurisdiction over the defendant even if the plaintiff=s claims did not arise
from or relate to the defendant=s
activities purposefully directed to Texas. 
See BMC
Software Belgium, N.V., 83 S.W.3d at 796. 

In support of its special appearance
Intercarga relies on the Second Amended Affidavit of German Patricio Ruiz, which
states, among other things:

$                  
Intercarga is an Ecuadorean corporation whose principal office
is in Ecuador.

$                  
Fritz expressed an interest in bidding on the Arco Project and
having Intercarga handle the Ecuadorean aspects of the shipping.

$                  
In October of 1997, Ruiz traveled on behalf of Intercarga to
Tulsa, Oklahoma to meet with Arco=s contractor,
Fluor Daniel Williams Brothers and with Fritz personnel to discuss Intercarga=s potential
involvement in the local part of the work involved in the proposed bid that
Fritz wanted to make on the Arco Project.








$                  
In route to Tulsa, Ruiz had to change planes in Miami and then
again in Houston, because there were no direct flights from Ecuador to
Tulsa.  During Ruiz=s layover in
Houston, he spent the night in an area hotel. The next morning he took a flight
to Tulsa accompanied by Fernando Reyes of Intercarga and two Fritz employees,
Juli Fendley and Paul Garcia.

$                  
The evening after the meeting, Ruiz flew from Tulsa to Houston
in route to Ecuador, along with Fritz employees.  He took a plane out of Houston the next
morning following a brief tour of Fritz=s Houston
facilities.  According to Ruiz, there
were no business meetings in Houston either before or after the trip to Tulsa.

$                  
Arco entered into a written contract with Intercarga both for
itself and as Fritz=s representative.  The parties signed this contract in Ecuador.

$                  
Under the Arco contract, Fritz shipped Arco=s property from
Houston  to Ecuador, and Intercarga did
not take possession of this property until it arrived in Ecuador.

$                  
To govern the manner in which Fritz and Intercarga would handle
payments under the Arco contract, Fritz and Intercarga entered into a separate,
oral contract.  All of the terms of that
contract were Amade@ in Ecuador.  These terms were agreed upon by Ruiz on
behalf of Intercarga and Tony Garcia on behalf of Fritz.

$                  
Under the oral contract, Intercarga periodically wired payments
to Fritz at its main office in California.

$                  
With the exception of one meeting in Houston in February of
2000, all conversations pertaining to performance of the oral contract were
handled by telephone calls and principally by emails between Intercarga in
Ecuador and Fritz in San Francisco, California or Houston, Texas.

$                  
In February of 2000, Ruiz and two Intercarga accountants met in
Houston with representatives of Fritz to try to resolve the dispute over
billings under the oral contract.  A
second dispute resolution meeting took place in Miami in May of 2000.

$                  
Intercarga has never done business in Texas.  Intercarga has not entered into any contracts
in Texas, including the oral contract with Fritz.  No part of the oral contract between
Intercarga and Fritz required performance in Texas or was performed in Texas.

$                  
Intercarga has not recruited any employees in Texas.








$                  
Intercarga has not done any of the following in Texas: (1)
maintained an office or regular place of business; (2) owned or leased any
property; (3) had employees residing or regularly traveling to Texas (4)
produced, marketed or distributed goods, services or products; (5) had phone
listings or mailing addresses; (6) incurred or paid any property taxes; and (7)
maintained or designated a registered agent for service of process.

$                  
Intercarga has not directed any advertising specifically
towards Texas residents, or advertised in any publications that are directed
primarily toward Texas residents.

$                  
Intercarga has never entered into any contracts with a Texas
choice of law or forum selection clause or entered into a contract that requires
performance in Texas.

In his affidavit on behalf of Fritz, Tony Garza stated:

$                  
Garcia was manager of Fritz=s Houston office
from 1994-2001.

$                  
In 1997, Fritz was asked by Arco to bid on the Arco Project
under which approximately $350 million dollars worth of oil field
equipment  would be transported from its
location of manufacture through the seaport of Houston, Texas, and then to
locations in Ecuador.

$                  
When it was preparing its bid for the Arco Project, Fritz did
not have a registered office in Ecuador, so it contacted several potential
companies who might be able to assist Fritz with the Arco Project.  As part of this effort, Fritz contacted
Intercarga, with whom Fritz had done business in the past.

$                  
Fritz told Intercarga that it should send a representative to
Houston, Texas, for a face-to-face meeting with Fritz employees so Fritz could
determine whether Intercarga had the necessary qualifications and experience to
work as part of the Fritz team on the Arco Project.

$                  
Fritz met with several companies and ultimately selected
Intercarga as a result of its September 8, 1997 meeting with Intercarga in
Houston, Texas.

$                  
On September 8, 1997, Fritz employee Max Pischel picked up two
Intercarga representatives from their hotel in Houston, TexasCPatricio Ruiz, Intercarga=s general manager,
and Fernando Reyes, Intercarga=s operations
director.  Pischel brought Ruiz and Reyes
to Fritz=s office in Houston, Texas.








$                  
During the September 8, 1997 meetings, Ruiz and Reyes met for
several hours with Fritz employees to discuss Intercarga=s experience and
qualification regarding the Arco Project. 
Garza met with Ruiz during these meetings and discussed Intercarga=s qualifications,
Fritz=s project management role, the
Houston-based inventory-tracking system to be used on the Arco Project, and
Intercarga=s knowledge of the local areas in Ecuador
through which the equipment would have to be transported.

$                  
During the September 8, 1997 meeting between Ruiz and Garza,
Ruiz showed Garza pictures of other equipment Intercarga had transported in
Ecuador.  Garza told the Intercarga
representatives that Fritz=s Houston office
would be command central for this project since the equipment had to move
through the Houston seaport and since the inventory-tracking system was based
in Houston.

$                  
Based on Intercarga=s representations
and other information provided  in
Houston, Fritz selected Intercarga as the company Fritz would introduce to Arco
as part of the Fritz team on September 9, 1997.

$                  
On September 9, 1997 Fritz employees flew to Tulsa, Oklahoma,
with Ruiz and Reyes, and they all met with Arco and Arco=s contractor Fluor
Daniel Williams Brothers for a bid presentation.

$                  
On September 10, 1997, in anticipation of getting the Arco
Project, Ruiz and Reyes met again in Houston, Texas with Fritz employees and
toured Fritz=s export packing facility in Houston
regarding project logistics.

$                  
From September through December of 1997, Intercarga provided
information to Fritz in Houston by telephone and facsimile to be included in
the bid to Arco.

$                  
On December 12, 1997, Fritz sent its bid to Arco in Ecuador
through Intercarga.  On December 15,
1997, Intercarga delivered the bid to Arco and faxed Fritz to notify it that
the bid had been delivered.

$                  
Fritz and Intercarga agreed that Intercarga, as representative
of Fritz, would take the job as “Contractor” and would sign all project related
contracts with Arco.  Under this
agreement, Fritz would bill Intercarga for its Arco Project services.  Intercarga would then bill Arco, collect the
money and wire transfer it to Fritz in San Francisco, California.

$                  
On February 10, 1998, Fritz held an Arco Project kick-off
meeting in Houston that was attended by Intercarga=s Fernando Reyes
by conference call.

$                  
On February 27, 1998, Intercarga was formally notified by Arco
that Fritz/Intercarga had won the project.

$                  
Intercarga signed the contract with Arco.








$                  
On July 14, 1998, Fritz held an Arco Project action meeting in
Houston, which was attended by Intercarga=s Ruiz and Cecil
Calderon by conference call.

$                  
On February 16B20, 1999, Fritz
held an Arco Project operational issues meeting in Houston that was attended in
person by Intercarga=s Cecil Calderon.

$                  
From approximately mid 1998 to early 2000, Intercarga routinely
communicated with Fritz regarding the Arco Project by email, facsimile,
telephone, and the inventory-tracking system that was run on a computer server
located in Houston.

$                  
On February 29, 2000, Fritz and Intercarga held an Argo Project
accounting issues meeting in Houston in an attempt to resolve Intercarga=s failure to pay
Fritz money that Fritz claims is owed. This meeting was attended by Ruiz and
two Intercarga accountants.

$                  
Intercarga=s failure to pay
money owed to Fritz caused Fritz employees in Houston to be denied a bonus
because of the failure to collect the full amount Fritz claims is owed.

$                  
Fritz provided services under the Arco
contract from 1998 to 2001.

The contract that was signed by Arco and
Intercarga states that it “is entered into by and between [Arco] and INTERCARGA
S. A., a Representative of FRITZ COMPANIES, INC. with offices in Av. Brasil No.
1708 y El Condor, Quito, Ecuador (>Contractor=).”  Under the contract, the “Contractor” has
extensive obligations to do all of the following:

$                  
manage the transportation of Arco=s goods from
vendor facilities to “Contractor=s facility”

$                  
manage the transportation, loading, and unloading of Arco goods
from “Contractor=s facility” to the point of embarkation

$                  
receive Arco=s material at
“Contractor=s facility”

$                  
perform detailed line item inspection and warehouse such
material at “Contractor=s facility” in an area dedicated entirely
for Arco material

$                  
crate, package, and label Arco material,
as specified by Arco.








The contract designated
Ruiz as the Contractor Representative “who shall be responsible for the
supervision of all Work performed.”  The
contract explicitly anticipates some transportation through Houston by
reflecting transportation rates from Houston, among other places.  While the contract does not specify where
“Contractor=s
facility” is located,  it is not disputed
that the Arco materials were all shipped through Fritz=s facility in
Houston.  Effective July 1, 1998, Arco
and Intercarga signed a document amending the contract for the sixth time.  The signature blocks on both the original
contract and the sixth amendment reflect that they were executed by “INTERCARGA
S.A.”

In Ruiz=s original affidavit, he
testified that “[i]n November or December, 1997, I traveled on behalf of
Intercarga to Houston, Texas to discuss with Fritz Intercarga=s potential involvement
in the local part of the work for [Arco].” 
He later changed this testimony to read as stated above in his amended
affidavit.  

After reviewing the
record, we conclude there is sufficient evidence to support the trial court=s implied finding that
Intercarga purposefully directed its activities to Texas.  The affidavit of Garza shows that two
representatives of Intercarga participated in two business meetings in Houston
in 1997 related to the Arco Project and that the first meeting was instrumental
in Fritz deciding to involve Intercarga in its bid on the Arco Project.  Garza=s
affidavit also shows that, during the first meeting, the Intercarga
representatives discussed Intercarga=s
experience and qualifications for the Arco Project, Fritz=s project management
role, the Houston-based inventory-tracking system to be used on the Arco
Project, and the fact that all of Arco=s
equipment would be transported through the port of Houston.  








Intercarga argues that we
should not consider these contacts because it claims that they relate to the
negotiation of the Arco contract rather than the contract that Fritz is suing
on in this case. Indeed, Intercarga goes even further and argues these contacts
should be ignored because they pertain to contract formation; whereas Fritz
complains in this suit only about contract performance.  The scope of our personal-jurisdiction
analysis is not as limited as Intercarga maintains.  To determine whether litigation results from
injuries that arise out of or relate to activities Intercarga has purposefully
directed to Texas, all of the activities Intercarga has so directed to Texas
must be taken into consideration.  See
P.V.F., Inc. v. Pro Metals, Inc., 60 S.W.3d 320, 326 (Tex. App.CHouston [14th Dist.]
2001, pet. denied).  In our
personal-jurisdiction analysis, we are not limited to the contacts directly
tied to Intercarga=s
alleged breach of contract; rather, we consider the entire sequence of
transactions that Intercarga has entered into with Fritz.  See id. at 326B27.  This sequence of events shows that Intercarga
purposefully directed its activities to Texas.

Intercarga came to
Houston in an effort to be selected by Fritz for the bid on the Arco
Project.  As a result of Intercarga=s activities in Texas,
Fritz selected Intercarga, and Intercarga executed the Arco contract.  Only Arco and Intercarga signed the Arco
contract.  Except for the obligations
imposed on Arco, all of the obligations under the Arco contract are imposed on
the “Contractor,” which is defined as “INTERCARGA S.A., a Representative of
FRITZ COMPANIES, INC.”[1]  Regarding the Contractor obligations, this
contract could be construed as binding only Fritz, both Intercarga and Fritz,
or only Intercarga.[2]  In his affidavit, Ruiz states that Intercarga
entered into this contract “both for itself and as Fritz=s representative.”  The contract does not state that Intercarga
has certain obligations for itself and other obligations only in a
representative capacity on behalf of Fritz. If, as Ruiz indicates, both
Intercarga and Fritz are liable under the Arco contract, then both corporations
would be responsible for performing all of the duties imposed on the Contractor
under that contract.  








The evidence is
sufficient to support a finding that Intercarga signed a contract with Arco
that imposes extensive obligations on Intercarga to manage the transportation
of Arco=s goods from the United
States to Ecuador.  Under this contract,
millions of dollars worth of Arco=s
goods were in fact shipped to Ecuador through Houston.   It is not disputed that, under the Arco
contract, Intercarga received the money that is the basis of this suit.  Intercarga contends that it may keep this money,
while Fritz asserts that Intercarga must pass it on to Fritz.  Intercarga executed a contract that has a
substantial connection to Texas.  See
Catlidge v. Hernandez, 9 S.W.3d 341, 347B49
(Tex. App.CHouston [14th Dist.]
1999, no pet.) (finding specific jurisdiction where plaintiffs= suit was based on
contracts that had a substantial connection with Texas).  There is also evidence that an Intercarga
employee attended an operational-issues meeting in Houston in February of 1999
and that, from the middle of 1998 through 2000, Intercarga routinely
communicated with Fritz regarding the Arco Project by email, facsimile,
telephone, and the inventory-tracking system that was run on a computer server
located in Houston, Texas.  We conclude
that Intercarga has purposefully directed its activities to Texas.  

Based on the facts in
this record, we also hold that the evidence is legally and factually sufficient
to support an implied finding by the trial court that Fritz=s claims against
Intercarga arise out of or relate to these activities of Intercarga.  There is evidence that Intercarga was chosen
for the Arco contract as a result of its activities purposefully directed
toward Texas.  Intercarga signed the Arco
contract, under which  millions of
dollars worth of Arco=s
goods were transported through and temporarily stored in Houston.  Fritz alleges Arco paid Intercarga more than
$1.7 million for transportation services through Houston provided by Fritz and
that Intercarga has breached its contract to pay this sum over to Fritz.  Intercarga seeks to separate this alleged
contract between Fritz and Intercarga from the Arco contract signed by
Intercarga and Arco.  Intercarga asserts
that the contacts regarding this separate contract are with Ecuador rather than
Texas.  Again, Intercarga cannot remove
contacts from our review simply by characterizing them as relating to a
different contract than the contract on which Fritz has sued, especially where
the evidence shows that both contracts are related to each other.  See P.V.F., Inc., 60 S.W.3d at 326. 









Following a meeting in Houston, Intercarga and Fritz paired
up to bid on the Arco Project. 
Intercarga admits that it signed the Arco contract both for itself and
Fritz.  Without reaching the merits, the
Arco contract arguably requires Intercarga to provide all of the transportation
services, not just those in Ecuador.[3]  Under this contract, the team of Fritz and
Intercarga successfully collaborated and transported millions of dollars of
Arco=s goods through Houston to
Ecuador.  Although there does not appear
to be any dispute with Arco, the two team members have disputed how the
compensation from the Arco contract should be divided between them.  Based on these facts, we conclude the
evidence is sufficient to support an implied finding by the trial court that
Fritz=s claims against
Intercarga arise out of or relate to the activities that Intercarga
purposefully directed to Texas.[4]  See Zac Smith & Co., Inc., 734
S.W.2d at 665B66
(finding personal jurisdiction over defendant that had no physical ties to
Texas based on defendant=s
execution of a joint-venture agreement outside of Texas whose sole purpose was
to build a hotel in Texas, because suit brought by supplier on subcontract was
related to the joint venture, even though the contract under which the joint
venture was to build the hotel was never performed); Transportacion Especial
Autorizada, S.A. de C.V. v. Seguros Comercial America, S.A. de C.V., 978
S.W.2d 716, 719B20
(Tex. App.CAustin 1998, no pet.)
(holding that specific jurisdiction existed over  Mexican corporation in suit brought by other
Mexican corporation, where defendant issued a bill of lading agreeing to
transport goods from Austin to Mexico City even though the defendant only
transported the goods from Nuevo Laredo to Mexico City); Fish v. Tandy Corp.,
948 S.W.2d 886, 895 (Tex.
App.CFort Worth
1997, writ denied) (finding specific jurisdiction where the claims of
distributor=s
president related to or arose from his negotiations with the manufacturer that
included personal visits to Texas and communications to and from Texas).  Therefore, the trial court had specific
jurisdiction over Intercarga, and we do not need to address the issue of
general jurisdiction.

After a court finds the
minimum contacts necessary to exercise personal jurisdiction over a nonresident
defendant, federal due process requires a determination of whether the exercise
of that jurisdiction comports with traditional notions of fair play and
substantial justice.  See Guardian
Royal Exch. Assur., Ltd., 815 S.W.2d at 228.  In deciding this issue, we consider the
following factors: (1) the burden on the defendant, (2) the interests of the
forum state in adjudicating the dispute, (3) the plaintiff=s interest in obtaining
convenient and effective relief, (4) the interstate judicial system=s interest in obtaining
the most efficient resolution of controversies, and (5) the shared interest of
the several states in furthering fundamental substantive social policies. Id.
When the defendant is a resident of another nation, we must also consider (a)
the unique burdens placed on the defendant who must defend itself in a foreign
legal system, and (b) the procedural and substantive policies of other nations
whose interests are affected by the assertion of jurisdiction by a state court
as well as the federal government=s
interest in its foreign-relations policies. Id. at 229. Only in rare
cases will the exercise  of personal
jurisdiction not comport with fair play and substantial justice when the
nonresident defendant has purposefully established minimum contacts with the
forum state.  Id. at 231.  Intercarga must present a compelling case
that the presence of some other considerations would render the exercise of
personal jurisdiction unreasonable.  See
id.  








While acknowledging Fritz=s interest in obtaining
convenient and effective relief through this suit in Texas, Intercarga asserts
that this interest is outweighed by the burden on Intercarga of defending this
suit in a foreign legal system and by Texas=s
lack of a strong interest in adjudicating this dispute.  Intercarga cites Ruiz=s testimony that it would
be unduly burdensome, extremely difficult, very time consuming, and enormously
expensive for Intercarga to defend itself in a Texas court.  Ruiz states that Intercarga has no offices or
employees in Texas and that litigating in Texas would require hiring Texas
attorneys, long-distance telephone calls from Ecuador and Miami (where Ruiz
lives), international travel,  and large
expenditures of time and money.  As to
the interest of Texas in this dispute, Intercarga asserts that Fritz is a
California corporation, and Intercarga is an Ecuadorean corporation.  Intercarga argues that Texas has little
interest in this dispute because Fritz is not a Texas citizen and because this
dispute has no connection with Texas.  








We conclude that
Intercarga has not made a compelling case that the exercise of personal
jurisdiction in this dispute would be unreasonable.   Distance alone is usually insufficient to
defeat personal jurisdiction because modern transportation and communication
have made it less burdensome to defend lawsuits in a state where the defendant
engages in economic activity.  Guardian
Royal Exch. Assur., Ltd., 815 S.W.2d at 231.  Further, the burden is mitigated by the fact
that Ruiz, the majority shareholder and general manager of Intercarga during
the time period of the events that gave rise to this dispute, currently lives
in Miami, Florida.  Fritz has already
taken Ruiz=s
deposition in this case in Miami regarding jurisdictional matters.  The record also contains a Rule 11 agreement
that, if Intercarga=s
special appearance is ultimately overruled, then Intercarga will make a
corporate representative available in Miami for a second deposition on the
merits of this dispute.  Further, as
discussed above, Fritz=s
claims arise out of or relate to Intercarga=s
activities purposefully directed to Texas. 
Even presuming that Fritz is not a Texas citizen,[5] the
record still shows that Fritz does a significant amount of business in Texas
and that Fritz has an office and an export packing facility in Houston.  This dispute relates to the transportation of
goods through the port of Houston, an activity in which Texas has a strong
interest.  While Texas=s interest would be
stronger if Fritz were a Texas citizen, we nonetheless conclude that Fritz=s interest in obtaining
convenient and effective relief and Texas=s
interest in adjudicating this dispute outweigh the burdens placed on Intercarga
by requiring that it defend itself in a foreign legal system in Texas.  See McDermott v. Cronin, 31 S.W.3d
617, 622B23 (Tex. App.CHouston [1st Dist.]
2000, no. pet.) (holding exercise of personal jurisdiction comported with fair
play and substantial justice, even though case involved specific jurisdiction,
no party was a Texas resident, and defendant was resident of Belize).  After carefully considering all of the
relevant factors, we hold the exercise of personal jurisdiction over Intercarga
in this case comports with traditional notions of fair play and substantial
justice.  

Accordingly, we overrule
Intercarga=s
sole issue on appeal.

B.  Did the trial court err in sustaining Ruiz=s special appearance?

In its sole issue on
cross-appeal, Fritz asserts that the trial court erred when it sustained Ruiz=s special
appearance.  Fritz=s petition does not
assert claims directly against Ruiz; rather it seeks recovery against
Intercarga on various claims and then seeks to pierce the corporate veil
between Intercarga and Ruiz so as to recover against Ruiz.  After reviewing the record, we find no
evidence in the record to show that Fritz=s
piercing-the-corporate-veil allegations arise out of or relate to activities of
Ruiz purposefully directed to Texas. 
Likewise, the evidence supports the trial court=s implied finding that
Ruiz has not maintained systematic and continuous contacts with Texas that
would give rise to general jurisdiction. 
See BMC
Software Belgium, N.V., 83 S.W.3d at 796.  

Furthermore, if Fritz
seeks to use Intercarga=s
contacts with Texas as Ruiz=s
contacts, Fritz has the burden to prove that facts exist that would justify piercing
the corporate veil.  See id. at 798B99.  There is no evidence in the record to support
a finding that Ruiz is the alter ego of Intercarga or to support any other
theory for piercing the corporate veil.  See
id.  Therefore, the trial court was
correct in its implied finding that Fritz did not meet its burden of proof
regarding its piercing-the-corporate-veil allegations.  Intercarga=s
contacts cannot be counted as Ruiz=s
contacts.  








There is sufficient
evidence in the record to support the trial court=s
implied findings that Ruiz=s
contacts with Texas alone do not show the minimum contacts with Texas necessary
under either specific or general jurisdiction. 
Therefore, the trial court did not err in sustaining Ruiz=s special appearance.  Accordingly, we overrule Fritz=s sole issue on
cross-appeal.

Having overruled
Intercarga=s
issue on appeal and Fritz=s
issue on cross-appeal, we affirm the trial court=s
judgment.

 

 

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered and Memorandum Opinion filed June 19, 2003.

Panel consists of Justices Yates, Anderson, and Hudson.











[1]  The original
Arco contract contains only this definition. 
The sixth amendment to the original Arco contract defines “Contractor”
as
“INTERCARGA S.A.” on the signature page and then as “INTERCARGA S.A., a
Representative of FRITZ COMPANIES, INC.” in another part of the contract. 





[2]  In determining
personal jurisdiction, we examine the jurisdictional facts relating to the parties
substantive allegations, without regard to the merits of the substantive
allegations. See Zac Smith & Co., Inc., 734 S.W.2d at 666; Baldwin
v. Household Intern., Inc., 36 S.W.3d 273, 277 (Tex. App.CHouston [14th Dist.] 2001, no pet.). In deciding this
case, we do not attempt to adjudicate the merits of the parties= claims regarding
the Arco contract or the contract, if any, between Intercarga and Fritz.





[3]  We base our
analysis on the actions of Intercarga, for example, signing the Arco contract;
we do not base our analysis on the actions of Fritz, for example, the fact that
Fritz actually performed the transportation services relating to the transport
of Arco=s goods through the port of Houston.





[4]  Intercarga
argues that the evidence is not sufficient to support an implied finding of
specific jurisdiction and cites U-Anchor Advertising, Inc. v. Burt, 553
S.W.2d 760, 763 (Tex. 1977).  We find
that this case is not on point here.  In U-Anchor
Advertising, Inc, the services contract on which defendant was sued had
been solicited, negotiated, and consummated in Oklahoma, and the only contact
that defendant had with Texas was mailing six or seven contract payments to
plaintiff at its office in Texas. See U-Anchor Advertising, Inc., 553
S.W.2d at 761B63.  These facts
are significantly different from those before us today.





[5]  Fritz is a
California corporation; however, the record is unclear as to whether Fritz=s principal place of business is in Texas or
elsewhere.  For the purposes of our
analysis, we presume that Fritz=s principal place of business is not in Texas.